Filed 7/17/14  In re E.V. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re E.V., a Person Coming Under the Juvenile Court Law. | B253172 (Los Angeles County Super. Ct. No. CK58192) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,   Plaintiff and Respondent,   v.   R. V. et al.,   Defendants and Appellants. | |

APPEAL from an order of the Juvenile Court of Los Angeles County.  Jacqueline Lewis, Referee Presiding.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal for Defendant and Appellant R. V.

Jamie A. Moran, under appointment by the Court of Appeal for Defendant and Appellant Joseph B.

M. Elizabeth Handy and Heather Benton for minor E.V.

No appearance for Los Angeles County Department of Children and Family Services, Plaintiff and Respondent.

Appellants R. V. (Mother) and Joseph B. (Father) appeal from an order placing the child E.V. with a foster family instead of maternal grandmother G. F. (Grandmother). We affirm. The juvenile court acted within its discretion to conclude it was not in E.V.'s best interests to place her with Grandmother.

## FACTUAL AND PROCEDURAL BACKGROUND

*Detention.*

E.V., born in June 2013, came to the attention of the Los Angeles County Department of Children and Family Services (Department) when a referral reported that she and Mother tested positive for methamphetamine at E.V.'s birth. Although Mother had been discharged from the hospital, E.V. remained in the neonatal intensive care unit and was exhibiting withdrawal symptoms. When at the hospital, Mother told the referral that she had been exposed to a neighbor's methamphetamine smoke shortly before E.V.'s birth. The referral observed, however, that Mother had a flat affect and appeared to have been through this before. The referral could not ascertain the extent of E.V.'s exposure, as Mother had no records of prenatal care. When Mother and Father returned to the hospital three days after E.V.'s birth, they became upset because staff refused to release E.V. pending a Department investigation. Father created an uproar and falsely told hospital staff that a Department social worker had authorized E.V.'s release.

A social worker went to Mother's and Father's home the next day. They lived with Grandmother. Though Mother initially did not acknowledge the reason E.V. remained in the hospital, she ultimately conceded using methamphetamine before E.V.'s delivery. She described her use as an isolated recent incident, explaining she previously used drugs in high school and had participated in several drug rehabilitation programs. She denied using methamphetamine throughout her pregnancy and stated that E.V. must have tested positive as a result of breastfeeding. She also denied ever seeing Father use drugs and denied hearing him falsely say a social worker had been to their home before they went back to the hospital. In an interview later that day with E.V.'s nurse, the social worker learned that E.V. was tested for drugs immediately at birth, before Mother would

have had an opportunity to breastfeed.  The nurse also stated that Mother was present when Father said he had contact with the Department and Mother affirmatively corroborated his story.

The social worker also interviewed Grandmother, who said she was available for E.V.'s placement.  When asked if she understood why E.V. had not been released from the hospital, Grandmother stated:  "'I only know what the father said to me.  He told me that [Mother] and the baby tested positive for Methamphetamine.  I thought she quit drugs.  I had no idea.  She stopped going to her 12 step program when she met the father.'"  When asked whether she suspected that Father used drugs, Grandmother added, "I have never seen him.  Drugs are not tolerated here.  However, [Mother] met him through his cousin [] who is known to take drugs.  I wish he could drug test too.  I think he (father) does drugs too.'"

Grandmother then described her familiarity with Mother's prior dependency case involving E.V.'s half sister, Noelle O., born in 2002.  In 2005, the juvenile court sustained an allegation under Welfare and Institutions Code section 300, subdivision (b),[1] that Mother had a history of substance abuse and was a current abuser of alcohol, cocaine and/or marijuana, that she had a criminal history involving drug and alcohol abuse and that such abuse placed Noelle at risk.  Mother did not reunify with Noelle, and the matter resolved through a family law order granting joint legal custody of Noelle to Mother and her father, sole physical custody to her father and monitored visits to Mother.  Grandmother said that Noelle's father had taken away her guardianship of Noelle.

The Department obtained a removal order for E.V. and personally served it on Mother and Father.  That was the social worker's first opportunity to speak with Father, as prior efforts had been unsuccessful.  Father stated he thought the hospital was lying about Mother and E.V. testing positive for drugs, as he had not seen any paperwork confirming the tests.  He would not confirm or deny whether he was aware of Mother's

---

[1]     Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

drug use and said he did not know whether Mother had a history of drug use. He denied using drugs. He agreed to drug test, but ultimately never appeared. When asked whether he had a criminal record, he refused to answer any further questions. He was generally hostile and sarcastic throughout the interview. For example, when the social worker asked him to please clear his voicemail so she could contact him by leaving a message, he responded, "'You clear your voicemail.'"

The Department also spoke with Noelle's father, who described Mother's demeanor as consistent with someone under the influence of drugs. Mother currently had unmonitored visitation with Noelle for one-half of her winter and spring breaks, and for six weeks in the summer. Father characterized Mother's behavior with Noelle as that of 13-year-old babysitter, sleeping during the day, making Noelle fend for herself and not expressing interest in Noelle.

On June 18, 2013, Father arrived at the Department office with Grandmother and his mother. They all complained about E.V. being placed with a non-family member. When the social worker reminded Grandmother that it was problematic Mother and Father lived with her, she said they did not. The next day, the Department learned Father had been stopped by law enforcement in September 2012, and had admitted to both possessing and selling drugs. A search revealed that Father was carrying a pipe, a bag with a substance that tested positive for methamphetamine and 15 $20 counterfeit bills. The Department also learned both Mother and Father had extensive criminal histories, and Father was registered as a substance offender.

The Department assessed the risk to E.V. of future abuse or neglect as very high. It filed a dependency petition on June 21, 2013, alleging E.V. was at risk under section 300, subdivision (b) because she was born with a positive toxicology screen for amphetamine and methamphetamine (paragraph b-1); Mother had a history of substance abuse, used illicit drugs during pregnancy and had a positive toxicology screen for amphetamine and methamphetamine at E.V.'s birth (paragraph b-2); and Father had a history of substance abuse and was a current abuser of methamphetamine (paragraph b-3). In connection with its assessment whether there were any relatives available for

4

placement, the Department opined that Grandmother would not be appropriate because Mother and Father resided with her, and E.V. was assessed at an "F-Rate," meaning she would require specialized care as a result of her medical condition. The juvenile court found a prima facie case for detaining E.V. and gave the Department discretion to detain her with an appropriate relative.

### *Placement.*

Mother, Father and the Department had a Team Decision Meeting (TDM) on June 21, 2013, in which the Department explained why E.V. was being detained. Though Mother and Father initially denied most of the Department's accusations, Father admitted to using methamphetamine on June 20, 2013. Both Mother and Father began the intake process with the First Five Drug Program.

One week later, the Department prepared a pre-release investigation report for a paternal aunt, noting that a full assessment had not yet been completed. The Department further reported that Grandmother and a maternal aunt came to the Department to express Grandmother's interest in having E.V. placed with her. They stated there had been a miscommunication—that Mother and Father were not living with Grandmother and she had only proposed they live with her. The juvenile court directed the Department's jurisdiction/disposition report to address E.V.'s placement with an extended family member. Grandmother added that her job as a teacher allowed her to be home in the afternoons and during the summer to care for E.V.

The Department interviewed Mother and Father for the July 26, 2013, jurisdiction/disposition report. Though she could not recall their names, Mother had spoken with two inpatient treatment programs and was ready to begin when they had space available. She later provided a letter from one of the facilities confirming her statement. Though she admitted using methamphetamine before E.V.'s birth, she continued to deny that E.V.'s positive toxicology screen resulted from that use. Mother reported that most of her drug use had occurred in high school. She could not explain the reasons for her failing to reunify with Noelle. Mother reported she had never known Father to use drugs and they did not use drugs together. Father maintained the

5

Department had stolen his baby and remained upset that she was not placed with a family member. Contrary to his admission at the TDM, he denied any current drug use. In the report, the Department further confirmed that E.V. was doing well and no longer met the F-Rate requirements.

The jurisdiction/disposition report described Mother's history with the Department. In addition to the sustained petition involving Noelle, the Department received a referral concerning Grandmother's sexual abuse of Noelle related to inappropriate bathing. The allegation was deemed unfounded. An August 2012 allegation of general neglect against Mother during Noelle's visit was also deemed unfounded.

At the July 26, 2013 jurisdiction/disposition hearing, the juvenile court sustained the petition and found that E.V. was a person as described in section 300, subdivision (b). With respect to disposition, the juvenile court removed E.V. from Mother's and Father's custody and ordered that she remain placed with her foster family. It further directed Mother and Father to participate in a number of services and permitted them monitored visitation. The Department was to address relative placement in its next report.

For the August 23, 2013 hearing, the Department reported that Grandmother's home had been approved for placement, and wrote that Grandmother was willing and able to assist with reunification services and willing to provide permanency in the event reunification failed. The Department further reported that the paternal aunt's home had not been approved because of insufficient space. The juvenile court set the matter for a contested placement hearing after E.V.'s counsel expressed concern that Mother and Father might be living with Grandmother.

Before the contested hearing, Grandmother submitted points and authorities requesting that E.V. be placed with her. The Department submitted last minute information supporting E.V.'s release to Grandmother. It also submitted additional service records showing that a social worker spoke with Noelle on June 20, 2013, shortly after E.V. was detained. Noelle confirmed she had visited with Mother in April 2013.

6

When asked whether she felt safe with Mother she said, "'Yes, but not really.'" When asked when she would visit Mother next, she said she probably would not be visiting.

The Department prepared an interim review report for the October 4, 2013, placement hearing. Mother had enrolled in a residential recovery program and Father was incarcerated and attending a weekly substance abuse treatment program. The Department continued to advocate for E.V.'s placement with Grandmother. At the hearing, E.V.'s counsel indicated she had spoken with Noelle's father and received information that caused her some concern about E.V.'s placement with Grandmother. The juvenile court directed the Department to prepare a supplemental report regarding that information.

Before the continued hearing, Father wrote to the Department, requesting that E.V. be placed with Grandmother. The Department also obtained copies of letters Father wrote to Grandmother while he was incarcerated, criticizing Noelle's father's involvement in the case, thanking her for the money she had sent him and advising that he had advocated for E.V.'s placement with her.

In a second interim review report, the Department continued to recommend E.V. be placed with Grandmother. The report outlined a recent interview with Grandmother. She described a five-year custody battle for Noelle, explaining that Mother and Noelle lived with her until Noelle was two and one-half years old. According to Grandmother, Noelle's father had not been interested in caring for Noelle until he received notice that he was in arrears on his child support payments. He was able to obtain full custody of Noelle and thereafter effectively severed Grandmother's relationship with her. Grandmother blamed Noelle's dysfunctional behavior on her placement with her father. She believed that Noelle's father was currently lying and trying to manipulate Mother's relationship with E.V. During a telephonic interview, Noelle's father reported three concerns about Grandmother: She used corporal punishment as reported by Noelle during play therapy; she used an improper car seat; and she made inappropriate

7

comments to Noelle, such as telling her that her father was not her family and that she and Mother were her only real family. Grandmother said Noelle's father's statements were false.

Attached to the Department's report were excerpts from a 2009 child custody evaluation prepared pursuant to section 730 concerning Noelle. In the evaluation, Noelle's therapist expressed concern about Grandmother's relationship with Noelle. According to the evaluation, Noelle's therapist believed that Grandmother did not want Noelle to have a relationship with Mother without her own involvement. Noelle stated that Grandmother wanted Noelle to identify her as her mother. Both Mother and Noelle's father expressed concern that Grandmother saw herself as a parent. Noelle at times referred to Grandmother as "'the monster'" or "'the mean one,'" and she said that although she was afraid to tell the truth, Grandmother had hit her with a wooden spoon. Mother reported that Grandmother hit her with a wooden spoon when she was young. Though it was unclear whether actual physical violence or just the threat of violence had occurred, the therapist opined that Grandmother's residence was not a secure place for Noelle to live and that she was secure with her father. She further opined that it was not safe for Noelle to be alone with Grandmother and that Grandmother should be required to take a parenting class before visiting with Noelle. The therapist found validity to both of the alternating theories concerning the source of Noelle's stress after being removed from the care of Mother and Grandmother, noting on the one hand it appeared that she suffered traumatic events while in their care, and on the other hand that she missed them. The evaluation also confirmed that Grandmother repeatedly used an inappropriate car seat for Noelle. On a broader level, the evaluation generally found Grandmother's veracity to be questionable in certain situations; it further noted that on occasion, Grandmother said inappropriate things to Noelle and she overstepped boundaries.

At the November 8, 2013 contested placement hearing, the juvenile court admitted the Department's reports and Father's letters into evidence. It also received into evidence an e-mail summary of E.V.'s monitored visitation with all family members. The summary reported occasional conflict, with Mother saying she did not want Grandmother at the visits and telling Grandmother to get her own visits. E.V.'s counsel argued against placement with Grandmother, citing her concern that Grandmother stated she did not tolerate drugs in her household, yet at the same time permitted both Mother and Father to reside with her while they were using drugs. She also expressed concern about the contentious relationship between Mother and Grandmother, about Grandmother's relationship with Father and inconsistencies in her statements to the Department. Overall, counsel questioned the truthfulness of the entire situation and questioned whether Grandmother could be trusted to take care of E.V. by following court orders.

Though acknowledging the law's preference for placement with a relative, the juvenile court determined it was not in E.V.'s best interest to be placed with Grandmother. The court considered evidence of the level of "enmeshment and complication" in the relationship between Grandmother and Father, and stated it lacked "confidence that [Grandmother] is going to choose her granddaughter over the parents." It also questioned whether Grandmother could effectively facilitate reunification given her relationship with Mother. It ordered "loosely monitored" visits for Grandmother, with neither Mother nor Father as the monitor.

Mother and Father appealed. At E.V.'s counsel's request, we have taken judicial notice of a minute order showing that in January 2014, the juvenile court transferred the matter to Riverside County where Mother currently resides.

9

## DISCUSSION

Mother's and Father's sole contention on appeal is that the juvenile court abused its discretion by declining to place E.V. with Grandmother. We find no basis to disturb the placement order.[2]

## I. The Statutory Preference for Relative Placement and the Standard of Review

Under section 361.3, subdivision (a), "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative" when a child is removed from the physical custody of his or her parents pursuant to section 361. The statute provides a list of nonexclusive factors for the Department and the juvenile court to consider in determining whether placement with a particular relative is appropriate, the first being "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs." (§ 361.3, subd. (a)(1).)

Other statutory factors include: "(2) The wishes of the parent, the relative, and child, if appropriate. [¶] . . . [¶] (5) The good moral character of the relative and any other adult living in the home . . . . [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure and stable environment for the child. [¶] (B) Exercise proper and effective  care and control of the child. . . . [¶] . . . [¶] (D) Protect the child from his or her parents." (§ 361.3, subd. (a)(2)-(7).)

---

[2]  At this stage of the proceedings, Mother and Father have standing to challenge the placement decision. (See, e.g., *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054 ["placement of a child with a relative has the potential to alter the juvenile court's determination of the child's best interests and the appropriate permanency plan for the child, and may affect a parent's interest in his or her legal status with respect to the child"].)  We note that only E.V. has appeared as a respondent; the Department has not taken a position on appeal.

10

"'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) The relatives entitled to preferential consideration for placement are "an adult who is a grandparent, aunt, uncle, or sibling." (§ 361.3, subd. (c)(2).)

We review the juvenile court's decision on relative placement for abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067; accord, *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1420.) In connection with its placement order, "the court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse. [Citations.] 'Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' [Citations.]" [Citation.]' [Citation.]" (*Alicia B. v. Superior Court of San Diego County* (2004) 116 Cal.App.4th 856, 863.)

## II. The Juvenile Court Did Not Abuse Its Discretion in Declining To Place E.V. with Grandmother

Section 361.3, subdivision (e), provides that the juvenile court must state for the record the reasons for its denial of placement with a relative considered for placement under the statute. Here, the juvenile court expressly determined it would not be in E.V.'s best interests to be placed with Grandmother. (§ 361.3, subd. (a)(1).) It considered evidence of Grandmother's relationship with both Mother and Father, and found an inappropriate level of enmeshment between Grandmother and Father, and a problematic relationship between Grandmother and Mother. On that basis, it questioned whether Grandmother had the ability to provide a safe, secure and stable environment for E.V. (§ 361.3, subd. (a)(7)(A)), whether she would protect E.V. from the parents (§ 361.3, subd. (a)(7)(D)), and whether she would be able to effectively facilitate reunification services (§ 361.3, subd. (a)(7)(E)).

11

We find no abuse of discretion. "Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests." [Citation.]" (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855; see also *In re Joseph T.* (2008) 163 Cal.App.4th 787, 798 ["The relative placement preference, however, is not a relative placement *guarantee*"].) The juvenile court received considerable information from which it could conclude that placement with Grandmother was not in E.V.'s best interests. Turning to the factors emphasized by the juvenile court, there was evidence that Grandmother did not have the ability to provide a safe, secure and stable environment. Mother and Father both used drugs while residing with Grandmother. Though there were conflicting statements, there was also evidence that Grandmother hit or threatened to hit E.V.'s half-sister Noelle with a wooden spoon, just as she had hit Mother when she was a child. There was also evidence that Grandmother made inappropriate comments to Noelle and had difficulty maintaining appropriate boundaries. Noelle's therapist expressly opined that Grandmother's home was not a safe and secure place for Noelle.

With respect to Grandmother's ability to protect E.V. from her parents, the juvenile court considered the relationship between Grandmother and Father to contain a "level of enmeshment and complication" that would hinder any ability to protect E.V. Letters Father wrote to Grandmother while he was incarcerated showed that Grandmother had sent him money and he was hoping Grandmother would provide a job for him. The letters also contained troubling statements about Noelle's father, and suggested that Grandmother and Father were plotting to get custody of Noelle, or at least try to get her to say she wanted to live with Mother and Father when she turned age 12. Other evidence implied that Grandmother had accepted Father's drug use; she stated that drugs were not tolerated in her home and that she had never seen Father take drugs, but then immediately added that she believed he used drugs.

12

Finally, in connection with its concern that Grandmother may not have the ability to facilitate reunification services, the juvenile court considered evidence of conflicts between Mother and Grandmother concerning E.V.'s visitation, with Mother accusing Grandmother of interfering with her visitation. Mother's accusations mirrored previous concerns about Grandmother's involvement with Noelle. Noelle's therapist opined that Grandmother did not want Noelle to have an independent relationship with Mother. Indeed, notwithstanding the level of contentiousness between Mother and Noelle's father, they shared the concern that Grandmother saw herself more as a parent than a grandparent. They both had experiences where Grandmother would contradict them, typically by permitting Noelle to have something—such as candy or soda—that they had already told her she could not have. On the basis of this evidence, the juvenile court could question Grandmother's commitment to reunification.

In asserting the juvenile court abused its discretion, both Mother and Father point to evidence that supported E.V.'s placement with Grandmother, including that Grandmother expressed an interest in helping E.V. reunify with her parents or alternatively in providing permanence; her home was approved for placement; her school-year work schedule was conducive to caring for E.V.; and Mother and Father sought E.V.'s placement with her. But showing that evidence exists to support a contrary result fails to demonstrate an abuse of discretion. "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272.) A reviewing court will not disturb the juvenile court's exercise of discretion unless the decision was arbitrary, capricious, or patently absurd. (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.) "That another court might reasonably have reached a different result on this issue, however, does not demonstrate an abuse of discretion. An abuse of discretion may be found only if '"no judge could have reasonably reached the challenged

result.  [Citation.]"'"" (*O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, 269; accord, *In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

On the basis of the record as a whole, the juvenile court's finding that placement of E.V. with Grandmother would not be in her best interests was well within its discretion.  (See *In re Stephanie M., supra,* 7 Cal.4th at p. 321 ["regardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child"].)

## DISPOSITION

The juvenile court's placement order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J. [*]

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.